# UNITED STATES DISTRICT COURT
# DISTRICT OF KANSAS

| | | |
|---|---|---|
| MEDI-FLEX, INC., | : | |
| | : | Civil Action No. 06-2015 KHV-DJW |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| NICE-PAK PRODUCTS, INC. and | : | |
| PROFESSIONAL DISPOSABLES, INC., | : | |
| | : | |
| Defendants. | : | |
| | x | |

**MEMORANDUM OF DEFENDANTS NICE-PAK PRODUCTS, INC.
AND PROFESSIONAL DISPOSABLES, INC. IN OPPOSITION TO
<u>PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION</u>**

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES .................................................................................................. iii

I.      INTRODUCTION AND NATURE OF THE MATTER BEFORE
        THE COURT ..........................................................................................................5

II.     STATEMENT OF FACTS ......................................................................................7

III.    QUESTION PRESENTED.....................................................................................12

IV.     ARGUMENT.........................................................................................................13

        A.      Medi-Flex Is Not Likely To Succeed On The Merits ...........................................13

                1.      Governmental Bodies With Trademark Expertise
                        Have Repeatedly And Consistently Found No
                        Likelihood Of Confusion Between
                        CHLORASCRUB And CHLORAPREP ...................................................13

                2.      The Other Likelihood Of Confusion Factors
                        Militate Strongly Against A Likelihood Of
                        Confusion.................................................................................................14

                        a.      The Absence Of Actual Confusion Despite Four
                                Years Of Concurrent Use Of CHLORAPREP And
                                CHLORASCRUB In Canada And The United
                                States Militates Strongly Against A Likelihood Of
                                Confusion.....................................................................................14

                                i.      Canada.................................................................................15

                                ii.     The United States.................................................................16

                        b.      The "Strength" Of The Mark CHLORAPREP Is
                                Dubious .......................................................................................18

                        c.      The Competing Products And Their Packaging Are
                                Markedly Different ......................................................................21

                        d.      Medi-Flex Uses Misleading Arguments Regarding
                                The Price Of Goods And The Degree Of Care
                                Exercised By Purchasers ..............................................................22

                        e.      Medi-Flex's Survey Is Entitled To No Weight .............................23

                        f.      Medi-Flex's "Inference" Of Wrongful Intent By
                                Nice-Pak Is Baseless ...................................................................26

B.   Medi-Flex's Claim Of Irreparable Injury Is Belied By Its
     Own Egregious Delay And By Hard Facts ..........................................26

     1.   No "Presumption" Of Irreparable Harm Is
          Warranted Here ......................................................................27

     2.   Medi-Flex Sat On Its Purported Rights For At Least
          Six Months .............................................................................27

     3.   Medi-Flex's Other Arguments Regarding
          Irreparable Harm Are Belied By Hard Facts ...........................29

C.   Nice-Pak Would Be Grievously Injured By An Injunction...................33

D.   The Public Interest Militates Against An Injunction............................34

E.   If An Injunction Is Granted, A Substantial Bond Is
     Necessary ..............................................................................................35

V.   CONCLUSION...................................................................................................36

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Adidas Am. v. Nat'l Collegiate Athletic Ass'n*,
    40 F. Supp. 2d 1275 (D. Kan. 1999) ...................................................................23

*Aktiebolaget Electrolux v. Armitron Int'l, Inc.*,
    999 F.2d 1 (1st Cir. 1993) .............................................................................10

*American Cyanamid Corp. v. Connaught Laboratories, Inc.*,
    800 F.2d 306 (2d Cir. 1986) ...........................................................................15

*Banff, Ltd. v. Federated Dep't Stores, Inc.*,
    841 F.2d 486 (2d Cir. 1988) ...........................................................................15

*Big Dog Motorcycles v. Big Dog Holdings, Inc.*,
    402 F. Supp. 2d 1312 (D. Kan. 2005) .................................................................19

*Brunswick Corp. v. Spinit Reel Co.*,
    832 F.2d 513 (10th Cir. 1987)..........................................................................10

*Carling Brewing Co. v. Philip Morris, Inc.*,
    297 F. Supp. 1330 (N.D. Ga. 1968) ....................................................................9

*Corsearch, Inc. v. Thomson & Thomson*,
    792 F. Supp. 305 (S.D.N.Y. 1992) .....................................................................3

*Duluth News-Tribune v. Mesabi Pub. Co.*,
    84 F.3d 1093 (8th Cir. 1996)...........................................................................13

*Ethicon Endo-Surgery v. U.S. Surgical Corp.*,
    855 F. Supp. 1500 (S.D. Ohio 1994)...................................................................29

*Fisher Stoves, Inc. v. All Nighter Stove Works*,
    626 F.2d 193 (1st Cir. 1980) ...........................................................................13

*GTE Corp. v. Williams*,
    731 F.2d 676 (10th Cir. 1984)..........................................................................23

*Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*,
    182 F.3d 598 (8th Cir. 1999)...........................................................................11

*Ill. Tool Works, Inc. v. Grip-Pak, Inc.*,
    906 F.2d 679 (Fed. Cir. 1990) .........................................................................29

*Johnston v. Simmons*,
  45 F. Supp. 2d 1220 (D. Kan. 1999) ...................................................................3, 8

*Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.*,
  828 F.2d 1482 (10th Cir. 1987).............................................................................13

*Kan. Health Care Ass'n v. Kan. Dep't of Soc. & Rehab. Servs.*,
  31 F.3d 1536 (10th Cir. 1994)...............................................................................22

*Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*,
  43 F.3d 922 (4th Cir. 1995)...................................................................................14

*Maritz, Inc. v. Cybergold, Inc.*,
  947 F. Supp. 1328 (E.D. Mo. 1996) .....................................................................22

*Nora Beverages, Inc. v. Perrier Group of Am., Inc.*,
  269 F.3d 114 (2d Cir. 2001) .................................................................................13

*Paramount Pictures v. Video Broad.*,
  724 F. Supp. 808 (D. Kan. 1989) .........................................................................23

*Primedia Intertec Corp. v. Tech. Mktg. Corp.*,
  35 F. Supp. 2d 809 (D. Kan. 1998) ......................................................................22

*Standard Oil Co. of N.M. v. Standard Oil Co. of Cal.*,
  56 F.2d 973 (10th Cir. 1932)................................................................................22

*Therma-Scan, Inc. v. Thermoscan, Inc.*,
  295 F.3d 623 (6th Cir. 2002).................................................................................14

*United States v. Foote*,
  413 F.3d 1240 (10th Cir. 2005).............................................................................19

*Versa Products Co. v. Bifold Co.*,
  50 F.3d 189 (3d Cir. 1995) ...................................................................................11

## STATUTES, RULES & OTHER AUTHORITIES

18 U.S.C. § 1001 .........................................................................................................4

15 U.S.C. § 1052(d) ..................................................................................................4, 6

3 J. Thomas McCarthy, *McCarthy on Trademarks and
  Unfair Competition* § 23:16 (2005).......................................................................13

Jerome Gilson, *Trademark Protection and Practice* § 3.01[2] (Supp. 2005)..................3

## I.   INTRODUCTION AND NATURE OF THE MATTER BEFORE THE COURT

Defendants Nice-Pak Products, Inc. ("NPP") and Professional Disposables, Inc. ("PDI"), the healthcare division of NPP (collectively "Nice-Pak"), respectfully submit this brief, along with the accompanying declarations of Linda Autore ("Autore Decl."), Jean Fleming ("Fleming Decl."), Gary Ford ("Ford Decl."), Dr. Richard Marchand ("Marchand Decl."), and Roy H. Wepner ("Wepner Decl."), in opposition to the motion by plaintiff Medi-Flex, Inc. ("Medi-Flex") for a preliminary injunction requiring Nice-Pak to discontinue use of the mark CHLORASCRUB for its chlorhexidine product based on purported infringement of Medi-Flex's mark CHLORAPREP.

As Nice-Pak will demonstrate, on the central issue of likelihood of success on the merits, Medi-Flex is extremely unlikely to succeed in proving that there is a likelihood of confusion between its mark CHLORAPREP and Nice-Pak's mark CHLORASCRUB. Nice-Pak actually obtained a federal registration for CHLORASCRUB, for the same category of goods now at issue, well *before* Medi-Flex applied to register CHLORAPREP. When Medi-Flex applied for its registration, Medi-Flex represented to the United States Patent and Trademark Office ("PTO") that its mark CHLORAPREP was not confusingly similar to any existing mark (necessarily including Nice-Pak's CHLORASCRUB). The PTO allowed the CHLORAPREP mark in the face of Nice-Pak's existing CHLORASCRUB registration; and on several subsequent occasions the PTO (as well as the Canadian Trade Marks Office) allowed one mark over the other without so much as a suggestion of a likelihood of confusion. In addition, the two marks CHLORAPREP and CHLORASCRUB have coexisted in the marketplace in Canada for some four years without a single reported instance of actual confusion.

As Nice-Pak will also demonstrate, the mark CHLORAPREP is weak; the products and their packaging are quite dissimilar; the purchasers of these products are sophisticated; and Medi-Flex's "survey" is so riddled with flaws as to be of no probative value.

On the issue of irreparable harm, as Nice-Pak will demonstrate, Medi-Flex delayed for at least six months in filing this action and thereafter seeking injunctive relief, thus demonstrating that Medi-Flex itself did not consider the matter to require any urgency.  With regard to Medi-Flex's only other contention that it will be irreparably harmed by Nice-Pak's product, namely, that Nice-Pak's CHLORASCRUB product will cause skin irritation that will somehow be held against Medi-Flex by the public and the FDA, as Nice-Pak will demonstrate, Medi-Flex's argument amounts to speculation built upon fiction.  In fact, a Medi-Flex declarant who had claimed that scientific literature supported the increased irritation theory admitted at her deposition that a study done by Medi-Flex itself, which was not produced or otherwise disclosed in this lawsuit by Medi-Flex, was inconsistent with that theory.

Finally, Nice-Pak will demonstrate that the balance of hardships favors denial of the requested injunction, since Nice-Pak has made a huge investment in its CHLORASCRUB product while Medi-Flex took no action.  Moreover, if Nice-Pak is required to obtain a new name for its product, it will have to go through a lengthy FDA approval process which could take many months.  Finally, with regard to the public interest, since Medi-Flex acknowledges that today it has a monopoly on the product category in question, granting the requested injunction will cause the public (including the providers who pay for medical care) to lose the benefits of competition.

A preliminary injunction is a "drastic and extraordinary remedy" which should be denied if the moving party — here, Medi-Flex — "fails to establish any requisite element" which it must do by "clear and unequivocal proof." *Johnston v. Simmons*, 45 F. Supp. 2d 1220, 1223 (D. Kan. 1999).  As will be demonstrated herein, Medi-Flex has failed to establish any one of the requisite elements for injunctive relief, and has certainly not done so by clear and unequivocal proof.  Accordingly, Medi-Flex's motion should be denied.

## II.    STATEMENT OF FACTS

Over the course of a decade, the government agencies in the United States and Canada which are charged with preventing concurrent registration of trademarks which are likely to cause confusion have been presented with no fewer than four opportunities to find a likelihood of confusion between CHLORASCRUB and CHLORAPREP.  *Not once did they do so*.

- ▪    As between Nice-Pak and Medi-Flex, Nice-Pak was actually the first to use and register its mark at issue here.  In particular, on July 5, 1988, Nice-Pak (and, more specifically, PDI) was issued U.S. Trademark Registration No. 1,494,769 ("the '769 Registration") for the mark CHLORASCRUB as used on "antimicrobial skin cleanser for human use only."  That mark remained on the Principal Register of the U.S. Patent and Trademark Office ("PTO") until January 9, 1995, when it was canceled because an affidavit of continuing use was not filed.  (Wepner Decl. Exh. A.)

- ▪    Under the pressure of expedited discovery, Nice-Pak has attempted to ascertain whether (as is normally the case) Medi-Flex caused a trademark search to be

conducted before it adopted the mark CHLORAPREP.[1]  Medi-Flex's responses have been shrouded in vague claims of privilege.  It does appear that Medi-Flex received legal advice in connection with CHLORAPREP before it filed its application for registration, but Medi-Flex refuses to divulge any details.  Medi-Flex's privilege log (Wepner Decl. Exh. P) identifies one "Letter re possible federal registration of CHLORAPREP" from a Kansas City intellectual property law firm to Medi-Flex dated June 8, 1993 and another such letter dated October 7,1993.  That being the case, it is reasonable to infer — at least for present purposes in this accelerated proceeding — that Medi-Flex did obtain information regarding the existence of previously registered marks (through a search or otherwise) and was provided with an opinion as to whether CHLORAPREP was confusingly similar to those preexisting registered marks.  After all, if no prior marks had been located, on what might counsel be opining?

- On November 22, 1993 — while Nice-Pak's '769 Registration was still in force — Medi-Flex filed the application which would later mature into Medi-Flex's U.S. Trademark Registration No. 1,930,248 ("the '248 Registration") which it asserts here. (Wepner Decl. Exh. B.)  As required by the trademark laws, Medi-Flex's vice president signed a declaration (subject to punishment by fine or imprisonment under 18 U.S.C. § 1001) in which he declared that:

> [H]e . . . believes applicant [*i.e.*, Medi-Flex] to be entitled to use such mark [*i.e.*, CHLORAPREP] in commerce; to the best of his . . . knowledge and belief no other person, firm, corporation or association has the right to use the above-identified mark in commerce, either in the identical form thereof or in

---

[1] Companies adopting new trademarks commonly obtain searches performed by well-known vendors.  *See Corsearch, Inc. v. Thomson & Thomson*, 792 F. Supp. 305 (S.D.N.Y. 1992).  One commentator has observed that the failure to search at all "is nothing more than business Russian roulette."  Jerome Gilson, *Trademark Protection and Practice* § 3.01[2], at 3-7 (Supp. 2005).

> such near resemblance thereto as to be likely, when used on or in connection with the goods or services of such other person, to cause confusion, or to cause mistake, or to deceive . . . .

(*Id.* at 31-32.)  This necessarily included Nice-Pak's subsisting '769 Registration for the mark CHLORASCRUB.

▪        On April 18, 1994 — while Nice-Pak's '769 Registration was still in effect, the Examining Attorney at the PTO did a search which included a search for marks which included the prefix "chlora."  (Wepner Decl. Exh. B at 29.)  According to the Examining Attorney, that search turned up no marks which would warrant a refusal to register under § 2(d) of the Lanham Act, 15 U.S.C. § 1052(d).   And on July 1, 1994 — while the Nice-Pak '769 Registration was still extant — a Notice of Publication was issued.  (*Id.* at 28.)  No opposition was filed; Medi-Flex ultimately filed proof of use; it's registration issued on October 14, 1995; and it has been kept in force by Medi-Flex since then.  (*Id.* at 6.)

▪        On March 16, 2001, in preparing to reintroduce CHLORASCRUB, Nice-Pak filed U.S. Trademark Application Serial No. 76/225,557 ("the '557 Application") seeking to again register CHLORASCRUB for "antimicrobial skin cleanser for human use only" (*i.e.*, the same mark for the same goods as Nice-Pak's lapsed '769 Registration).   (Autore Decl. ¶ 6.)   At the time Nice-Pak filed this application, Medi-Flex's asserted '248 Registration for CHLORAPREP had been in force for over five years.   Nonetheless, with the Examining Attorney having failed to find a likelihood of confusion between CHLORASCRUB and CHLORAPREP (or any other mark), the '557 application was published for opposition on September 4, 2001.  (Wepner Decl. Exh. C at 4.)   Neither Medi-Flex nor anyone else opposed the application, such that it was "allowed" (*i.e.*, only proof of use was needed to obtain a registration).  (*Id.*)  However,

after several extensions of time to file proof of use were requested and granted because

FDA approval had not yet been obtained, no proof of use was filed, and the '557

Application went abandoned as of November 28, 2004.  (*Id.* at 3-4; *see also* Autore Decl.

¶ 6.)

    ■    On June 7, 2004 (*i.e.*, before the abandonment of the '557 Application),

Nice-Pak filed yet another application to register CHLORASCRUB for "antimicrobial

skin cleanser for human use only," namely, Application Serial No. 78/431,033 ("the '033

Application").  (Wepner Decl. Exh. D; Autore Decl. ¶ 5.)  Unlike Nice-Pak's prior '557

Application, its '033 Application did result in the issuance of an "office action" by the

PTO involving a technical matter.[2]  However, the office action did make a specific

finding that no conflicting marks were found:

> The examining attorney has searched the Office records and has found no
> similar registered or pending mark which would bar registration under
> Trademark Act Section 2(d), 15 U.S.C. § 1052(d).  TMEP § 704.02.

(Wepner Decl. Exh. D at 7.)  This finding was made in the face of Medi-Flex's asserted

'248 Registration for CHLORAPREP.  Moreover, once again, the trademark Examining

Attorney's search notes indicated that existing marks including the phrase "chlora" had

been searched.  (*Id.* at 5.)  After the matter raised in the office action was addressed, the

'033 Application was published for opposition.  (*Id.* at 3.)  This time, however, Medi-Flex

did file an opposition.[3]

---

[2] That technical matter was the continued pendency of Nice-Pak's own '557 Application,
with the PTO taking the position that since the applications were identical, one of the two
would have to be abandoned.  (Wepner Decl. Exh. D at 6-7.)  In a subsequent response,
the PTO was advised that the earlier filed '557 Application had indeed gone abandoned,
such that the issue was moot.  (*Id.* at 11-12.)

[3] Consistent with its leisurely approach to this matter (*see infra* Part IV.B.2), Medi-Flex
first sought and obtained additional time in which to file its opposition, and ultimately

▪       The same pattern of the marks CHLORASCRUB and CHLORAPREP being approved for registration in the face of one another (without any opposition being filed) occurred in Canada, albeit only one application from each party was involved.  In Canada, Medi-Flex obtained Canadian Registration No. TMA475702 on May 5, 1997, for the mark CHLORAPREP for "topical antimicrobial solutions."  (Wepner Decl. Exh. E at 1.)  Some four years later, on September 5, 2001, Nice-Pak filed an application in Canada to register CHLORASCRUB for "antimicrobial skin cleanser for human use only."  This Canadian application was "advertised" (*i.e.*, published) for opposition on January 15, 2003, but no opposition was filed by Medi-Flex or anyone else, and Nice-Pak received Canadian Registration No. TMA475702 on June 18, 2003.  (*Id.* at 3.)

In June 2005, Nice-Pak issued a press release indicating that it was planning to launch its CHLORASCRUB antiseptic skin preparation product having 3.15% chlorhexidine gluconate ("CHG").  (Autore Decl. ¶ 7, Exh. B.)  This was done in conjunction with an educational conference in Baltimore which was attended by several Medi-Flex employees.  (*Id.* ¶ 8.)

On June 23, 2005, an e-mail was circulated at Medi-Flex regarding CHLORASCRUB having received FDA approval.  (DX 1.)  As to whether Medi-Flex people believed that CHLORASCRUB infringed CHLORAPREP, "Some did; some didn't . . . . Nobody was firm on it."  (Schreiber Dep. 19-20.)[4]

---

filed it on December 19, 2005, nearly four months after the mark was published. (Wepner Decl. Exh. D at 3.)

[4] Excerpts from the depositions of Medi-Flex's declarants are attached to the Wepner declaration as Exhibits F (Schreiber), G (McBride), H (Crosby), I (Brandmeyer), and J (Gelb).

On July 12, 2005, Medi-Flex's counsel sent a protest letter to Nice-Pak relating to the press release as well as certain Nice-Pak marketing materials for CHLORASCRUB. The letter was primarily concerned with advertising allegations.  Near the end of the letter, Medi-Flex "reserve[d] all of its rights to object to and oppose PDI's use of the name 'Chlorascrub' . . . . ," which it said was confusingly similar to CHLORAPREP. (Autore Decl. ¶9.)  Shortly thereafter, Nice-Pak responded to the letter, refuting all of Medi-Flex's allegations, including trademark infringement.  (*Id.*)[5]

In October 2005, Medi-Flex managers saw an ad for CHLORASCRUB.  (Wepner Decl. Exh. K.)  They discussed the claims that were made by Nice-Pak about the product and discussed the product's availability (Schreiber Dep. 22-27) — but *not* the trademark.

Nice-Pak heard nothing further from Medi-Flex about the CHLORASCRUB trademark until a process server delivered the complaint in this action on January 17, 2006, more than six months after Medi-Flex became aware of the impending launch of CHLORASCRUB.

III.    **QUESTION PRESENTED**

Has Medi-Flex carried its burden of proving, by "clear and unequivocal proof," *Johnston*, 45 F. Supp. 2d at 1223, entitlement to a preliminary injunction, including a showing that it is likely to succeed on the merits, that it will be irreparably harmed absent an injunction, that the balance of hardship favors Medi-Flex over Nice-Pak, and that the public interest would be served by injunction?

Nice-Pak respectfully submits that Medi-Flex has carried its burden on *none* of these factors.

---

[5] During September 2005, the parties' attorneys had discussions which related only to Medi-Flex's advertising allegations and not to the trademark CHLORASCRUB.

IV.   **ARGUMENT**

A.   **Medi-Flex Is Not Likely To Succeed On The Merits**

The central issue in connection with Medi-Flex's motion is whether there is a likelihood of confusion based upon the concurrent use of Medi-Flex's mark CHLORAPREP and Nice-Pak's mark CHLORASCRUB.   As Nice-Pak will first demonstrate, the most credible and unbiased evidence — a series of determinations by the government agencies responsible for registering trademarks in the U.S. and Canada, over the course of a decade — makes clear that confusion is not only unlikely; it is virtually inconceivable.   As Nice-Pak will then demonstrate, under the other factors traditionally considered in determining whether a likelihood of confusion exists, the evidence points decidedly away from a finding of a likelihood of confusion.

1.   **Governmental Bodies With Trademark Expertise Have Repeatedly And Consistently Found No Likelihood Of Confusion Between CHLORASCRUB And CHLORAPREP**

The repeated failure by trademark examiners in the United States and Canada to find any likelihood of confusion between CHLORASCRUB and CHLORAPREP, as documented in Part II, is entitled to "respectful consideration" by this Court.   As explained in *Carling Brewing Co. v. Philip Morris, Inc.*, 297 F. Supp. 1330 (N.D. Ga. 1968):

> While the various Patent Office decisions referred to are not binding upon this court, they are certainly entitled to the most respectful consideration because of the Patent Office's day-to-day expertise in adjudicating cases where the ultimate question decided is the question of "likelihood of confusion" as that term is employed in various parts of the Lanham Act.   The fact that the Patent Office does not have jurisdiction to determine whether the use of a mark should be enjoined in no way affects the pertinence and applicability of its decisions on the ultimate question of likelihood of confusion.

*Id.* at 1337 (citations omitted).

Medi-Flex will likely argue that the Court should dismiss these instances where government officials charged with policing against confusion concluded that no such confusion was present. Perhaps one isolated instance of the type discussed herein could be disregarded. But this clear pattern of no fewer than four instances (three by the U.S. PTO and one by the Canadian Trade Marks Office) over the course of a decade demonstrate a strong and clear pattern of objective decisions that CHLORASCRUB and CHLORAPREP are simply not confusingly similar to each other.[6]

### 2. The Other Likelihood Of Confusion Factors Militate Strongly Against A Likelihood Of Confusion

#### a. The Absence Of Actual Confusion Despite Four Years Of Concurrent Use Of CHLORAPREP And CHLORASCRUB In Canada And The United States Militates Strongly Against A Likelihood Of Confusion

In addressing the factors traditionally considered by courts in this Circuit and elsewhere regarding likelihood of confusion, Medi-Flex notes that "evidence of actual confusion" is one such factor (Medi-Flex Br. 5), but Medi-Flex has no evidence of *real* confusion in the *real* marketplace. In an effort to overcome that deficiency, Medi-Flex offers a survey and cites *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 522 (10th Cir. 1987), for the proposition that "a survey may be the only available method of showing the public's state of mind." (Medi-Flex Br. 8.)

---

[6] Interestingly, the FDA also screens product trademarks for new products seeking approval to make sure there is no likelihood of confusion with existing FDA-approved products. In May and June of 2000, FDA staff reported:

> The panel identified Chloragel, Chloraseptic, Chloroptic, and Chlorafed, but concluded that these names do not have the potential for name confusion with ChloraPrep One-Step.

(Wepner Decl. Exh. O.)

Fortunately, in contrast to the opinions offered by Medi-Flex's paid survey expert,[7] there is compelling evidence on the question of actual confusion: the *absence* of actual confusion in Canada despite four years of concurrent use of CHLORASCRUB and CHLORAPREP, including commerce between the United States and Canada, and the *absence* of actual confusion in the United States in the six months since Nice-Pak began to extensively advertise and promote CHLORASCRUB.

Numerous courts have indicated that the *absence* of actual confusion in the marketplace over a significant period of time provides strong evidence that confusion is unlikely. *See, e.g., Aktiebolaget Electrolux v. Armitron Int'l, Inc.*, 999 F.2d 1, 14 (1st Cir. 1993) ("an absence of actual confusion, or a negligible amount of it, between two products after a long period of coexistence on the market is highly probative in showing that little likelihood of confusion exists"); *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 603 (8th Cir. 1999) (defendant's use of accused mark over long period of time with plaintiff's knowledge makes plaintiff's failure to present evidence of consumer confusion "telling"). As explained in *Versa Products Co. v. Bifold Co.*, 50 F.3d 189 (3d Cir. 1995):

> If a defendant's product has been sold for an appreciable period of time without evidence of actual confusion, one can infer that continued marketing will not lead to consumer confusion in the future. The longer the challenged product has been in use, the stronger this inference will be.

*Id.* at 205.

### i. <u>Canada</u>

As documented in the Autore declaration, both Medi-Flex and Nice-Pak have employed their respective marks CHLORAPREP and CHLORASCRUB in Canada, on

---

[7] Nice-Pak addresses this survey in Part IV.A.2.e, *infra*.

essentially the same products that are here at issue,[8] for some *four years*. And as also documented in that declaration, not a single instance of actual confusion (such as misdirected mail or phone calls, or Medi-Flex products being returned to Nice-Pak, etc.) was ever reported — not one. (Autore Decl. ¶¶ 10-11.) Nor could Medi-Flex witnesses identify any instances of actual confusion in Canada. (Schreiber Dep. 50-51.)

### ii.  The United States

Nice-Pak has not learned of a single instance of actual confusion between CHLORAPREP and CHLORASCRUB in the United States. (Autore Decl. ¶ 13), notwithstanding the fact that Nice-Pak has been shipping CHLORASCRUB to Canada in commerce for years, has been promoting the product since mid-2005, and began taking orders for CHLORASCRUB in late November 2005 (*id.* ¶ 12).

One of Medi-Flex's declarants, Mark Brandmeyer, who claimed to have drafted his own declaration (Brandmeyer Dep. 5), stated under penalty of perjury that, "[a]n employee of a Medi-Flex-approved kit manufacturer has told *me* that 'there's going to be a lot of confusion when Chlorascrub comes out'" (Brandmeyer Decl. ¶6 (emphasis added)). Even if this were true, it would at most amount to one person's opinion or prediction, and it would certainly not constitute evidence of actual confusion.

But in fact, this turned out to be a falsehood. Mr. Brandmeyer admitted at his deposition that the statement was not made to him, but rather to another Medi-Flex employee named Bob Lutkewitte. (Brandmeyer Dep. 33-35.) Mr. Lutkewitte's claim to fame is that when he learned of the CHLORASCRUB product having received FDA

---

[8] Although Nice-Pak's Canadian product employs CHLORASCRUB as its brand (as is the case here in the United States), it has a different concentration of "CHG" than Nice-Pak's U.S. product employs. While not relevant to the likelihood of confusion analysis, the significance of "CHG" concentrations is discussed in Part IV.B.3, *infra*.

approval on June 23, 2005, he circulated this in an e-mail to 11 of his colleagues, in which he stated that the Nice-Pak "bastards are following close on our heels . . . ." (Brandmeyer Dep. 36-37.)

Medi-Flex may also attempt to rely on one or more reports purporting to document instances of supposed confusion between CHLORAPREP and CHLORASCRUB.  To date, Medi-Flex has not authenticated these reports; but what is clear is that they will not be admissible under the "business records" exception to the hearsay rule, since they were manifestly created for use in this lawsuit and *not* in the ordinary course of business.  (*See* Schreiber Dep. 52-53.)

Even if these reports are admissible, they do not demonstrate actual confusion. Nice-Pak believes that Medi-Flex will claim that actual confusion is demonstrated by one caller who asked if Medi-Flex's product was CHLORAPREP or CHLORASCRUB. Assuming this inquiry took place, it is *not* evidence of actual confusion.

The overwhelming weight of authority is that such inquiries are not evidence of confusion, but actually prove that individuals can and do draw a *distinction* between the two products.  *See, e.g., Duluth News-Tribune v. Mesabi Pub. Co.*, 84 F.3d 1093, 1098 (8th Cir. 1996) (question to reporter who was asked to specify which News-Tribune he worked for indicates "a distinction in the mind of the questioner, rather than confusion"); *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 124 (2d Cir. 2001) ("Inquiries about the relationship between the owner of a mark and an alleged infringer do not amount to actual confusion.  Indeed, such inquiries are arguably premised upon a *lack* of confusion between the products such as to inspire the inquiry itself." (emphasis in original)); *Fisher Stoves, Inc. v. All Nighter Stove Works*, 626 F.2d 193, 195 (1st Cir.

1980) (questions about affiliations of two companies indicate that customers were aware of the different product sources);  Restatement (Third) of Unfair Competition § 23 cmt. c (1995) ("evidence of inquiries by customers as to whether the plaintiff and the defendant are associated, however, may not establish the existence of actual confusion if the nature of the inquiries indicates that consumers perceive a difference between the designations and are skeptical of the existence of a connection between the users.")

In *Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1487 (10th Cir. 1987), the court held that while inquiry evidence is admissible and relevant, "standing alone with no other evidence, it is insufficient proof of actual confusion" (citing a prominent treatise).[9]

Given the fact that Nice-Pak has been promoting its CHLORASCRUB product for more than half a year, the failure of Medi-Flex to come forward with a single instance of real actual confusion constitutes further evidence that confusion in the United States is unlikely.

*          *          *

Clearly, the absence of actual confusion between the parties' CHLORASCRUB and CHLORAPREP products, over a period of four years, in the real world marketplaces of Canada and the United States, is telling evidence that confusion is *unlikely*.

**b.      The "Strength" Of The Mark CHLORAPREP Is Dubious**

The centerpiece of Medi-Flex's argument that the mark CHLORAPREP is "strong" is its repeated assertion that Medi-Flex's federal registration for CHLORAPREP has become "incontestable."  (*See* Medi-Flex Br. 1, 5, 6.)

---

[9] The pertinent portion in the current version of that treatise may be found at 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:16, at 23-78.7 (2005).

While incontestability sounds impressive and protects a registered mark from attack on certain grounds[10], it does not prove "strength" in and of itself. *See, e.g, Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 632 (6th Cir. 2002) (reliance on "presumption" of strength based upon incontestability is "misplaced"); *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 934-35 (4th Cir. 1995) (agreeing with commentator that incontestable registration is still subject to attack on "weakness" grounds). As shown below, the mark CHLORAPREP is actually highly descriptive and weak.

Medi-Flex makes much of its contention that the purportedly "dominant" portion of the two marks at issue — *i.e.*, CHLORA — is the same in each mark. (Medi-Flex Br. 10.) The fundamental problem with this argument — and the reason why Medi-Flex, Nice-Pak and other companies employ CHLORA — is that the prefix CHLORA is descriptive of products using chlorine-based components, if not completely generic.

In *American Cyanamid Corp. v. Connaught Laboratories, Inc.*, 800 F.2d 306 (2d Cir. 1986), the two products at issue were chemically identical vaccines which provided immunity against what was generically called HIB. The plaintiff, which used the mark HIB-IMUNE had obtained a preliminary injunction against the defendant's use of HibVAX. In reversing the injunction *and ordering dismissal of the complaint*, the Second Circuit held that because the generic term "Hib" could not be appropriated by the plaintiff for its exclusive use, any likelihood of confusion between HibVAX and HIB-IMUNE would have to be based on a similarity between the suffixes "vax" and "imune," which were completely different in length, sound and appearance. *Id.* at 308;

---

[10] An "incontestable" registration may still be attacked on at least nine grounds. *See* 5 McCarthy, § 32:149.

*see also Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 491 (2d Cir. 1988) (adhering to view that nongeneric components of a mark must be compared in the context of the overall composite mark).

Here, Medi-Flex readily admits that its CHLORAPREP product employs a chlorine derivative, *i.e.*, chlorhexidine gluconate ("CHG"). (Medi-Flex Br. 2.) Accordingly, the prefix CHLORA- is at best descriptive if not generic of Medi-Flex's goods.

Thus, in attempting to compare CHLORAPREP and CHLORASCRUB, the critical inquiry relates to the suffixes -PREP and -SCRUB. They are manifestly different. To be sure, they are not sufficiently similar to provide the type of strong showing that the marks at issue are similar to justify a preliminary injunction. They neither look nor sound alike. Medi-Flex argues that the "-PREP" and "-SCRUB" suffixes are nearly synonymous. (Medi-Flex Br. 10.) They are not. "Scrub" (as a verb) means to clean with abrasive action and, in the medical context, is used such as "the surgeon was preparing to scrub." *See Merriam-Webster Unabridged Dictionary*, *available at* http://www.unabridged.merriam-webster.com.

"PREP," which is short for "prepare," is itself highly descriptive as to products used in connection with "preparing" for a procedure. The weakness of "-PREP" is demonstrated by (i) the fact that Medi-Flex's own literature is riddled with descriptive (*i.e.*, non-trademark) uses of "prep" (*see, e.g.*, Medi-Flex Br. Exh. O), and (ii) the fact that another antiseptic surgical preparation product in this market is DURAPREP, which has been sold by 3M since well *before* Medi-Flex began using CHLORAPREP (*see* Wepner Decl. Exh. N).

Medi-Flex tries to create the illusion that Nice-Pak's own product instructions collapse "PREP" and "SCRUB" into a single sentence, to wit: "Defendants themselves instruct users of their 'Povidone-Iodine Scrub Swabsticks' to *scrub* the patient's skin to prep the patient for a particular medical procedure." (Medi-Flex Br. 10 (italics in original; underscoring added) (citing Exh. I).)   But Exhibit I actually says "Scrub procedure site as required"; it never adds the word "prep" as Medi-Flex insinuates.

### c. The Competing Products And Their Packaging Are Markedly Different

The actual products themselves, and the packaging in which they are sold, which will be presented to the Court at the preliminary injunction hearing, demonstrate that there are such significant differences between the packaging and the products as to even further diminish any conceivable possibility of confusion.

With regard to the packaging, the CHLORAPREP product is distributed in solid blue boxes and displays the Medi-Flex house mark on three sides.   In stark contrast, boxes for CHLORASCRUB are predominantly white, with a purple stripe and purple lettering.   Moreover, five of the six sides on the CHLORASCRUB packaging feature the well-known, distinctive green, red and blue "PDI" logo.   It is inconceivable that these boxes could be confused with one another.   (Autore Decl. ¶ 15; Fleming Decl. ¶ 11.)

In addition, the product applicators themselves are quite different in function and appearance, and they also differ in the manner in which they are used.   Indeed, none of the product sizes and delivery forms in the Nice-Pak CHLORASCRUB line correspond to any of Medi-Flex's CHLORAPREP products.   (Autore Decl. ¶¶ 16-17; Fleming Decl. ¶¶ 12-13.)

**d.** **Medi-Flex Uses Misleading Arguments Regarding The Price Of Goods And The Degree Of Care Exercised By Purchasers**

In arguing that the physicians and registered nurses who use the parties' products, and the buyers and distributors who purchase them, are not sophisticated and do not exercise meaningful care in their purchases, Medi-Flex attempts to paint a picture that individual units of its CHLORAPREP products are sold for less than $1.00 (Medi-Flex Br. 13; Brandmeyer Decl. ¶4) — suggesting that they are as cheap as a pack of gum picked up at the checkout counter at the last minute.

But Medi-Flex never sells them as single units. (Brandmeyer Dep. 22.) They are sold in cases containing as many as 2000 units. (*Id.* at 22-23.) The Medi-Flex Vice President of Sales who advanced these single-unit prices — most conveniently — could not provide even "ballpark" prices at which the cases are sold. (*See id.* at 23-26.) But if one multiplies the fictional per unit prices by the number of units in the cases (*see id.*), it is apparent that the cases sell for anywhere from about $100 to as much as $1,000. (*See also* Autore Decl. ¶ 19.)

Similarly, as explained in the Autore declaration, Nice-Pak's accused products come in cases of 30, 50, or even 100 units, with those cases selling at prices ranging from $120 to $270. (Autore Decl. ¶ 18.)

The purchasers and users of CHLORASCRUB are highly experienced professional buyers at hospitals and clinics. (*Id.* ¶ 14.) Similarly, as admitted by Medi-Flex employees at their depositions, those who purchase CHLORAPREP products directly from Medi-Flex, *i.e.*, buyers who work for the major distributors, are professional buyers, *i.e.*, "That's what they do for a living . . . ." (Brandmeyer Dep. 15-16.) Likewise, the materials managers at hospitals who buy these products from

the distributors are "essentially professional buyers." (Schreiber Dep. 15.) And the actual users of these products — nurses and physicians — are professionals who "attempt to be careful and conscientious in their work." (*Id.* at 28.)

Clearly, the products at issue are used by highly trained medical professionals. To the extent the products are purchased by distributors as Medi-Flex suggests (Medi-Flex Br. 12-13), while such distributors and their employees are not highly trained *medical* professionals (as Medi-Flex urges), they are people who buy medical products for a living. The suggestion that they are unsophisticated and careless about what they purchase for hospitals and clinics is baseless and has no support in this record.

### e.    Medi-Flex's Survey Is Entitled To No Weight

Medi-Flex relies on a survey conducted by Mr. Gabriel M. Gelb which was conducted over the Internet. As a threshold matter, Mr. Gelb acknowledges that he only surveyed nurses who would be *users* of CHLORAPREP and/or CHLORASCRUB products, and not the actual *purchasers*. As Medi-Flex itself makes clear, the products in question are sold through networks of distributors to hospitals and clinics as well as kit manufacturers. (Medi-Flex Br. 12-13; Brandmeyer Decl. ¶¶ 2-3.) Thus, it is manifest that Mr. Gelb did not even purport to measure confusion by prospective purchasers. (Gelb Dep. 8.) Rather, Mr. Gelb appears to be attempting to detect what is sometimes called "post-sale" confusion, *i.e.*, confusion among users and others after the actual sale takes place.

The fundamental problem with this approach is that while post-sale confusion may be actionable, that is only the case where "knockoff" or "counterfeit" goods of inferior quality are at issue. *See Big Dog Motorcycles v. Big Dog Holdings, Inc.*, 402 F. Supp. 2d 1312, 1334-35 (D. Kan. 2005) (holding survey to be of "essentially no

probative value" since not directed to purchasers); *see also United States v. Foote*, 413 F.3d 1240, 1246 (10th Cir. 2005) (finding post-sale confusion actionable under the counterfeit trademark act).   Not even Medi-Flex has suggested that Nice-Pak's CHLORASCRUB product is "counterfeit."

Even putting that aside, there are numerous other problems with the Gelb survey, as discussed in the concurrently filed declaration of Dr. Gary Ford, and as emerged from Mr. Gelb's deposition, including (but not limited to) the following:

- The "sample" was under-inclusive, because it excluded nurses who perform many procedures for which CHLORAPREP is used (Ford Decl. ¶¶ 23-25), and it also excluded physicians, medical students, clinicians, and others who perform these procedures (*see id.* ¶ 26; *see also* Gelb Dep. 15-17; Schreiber Dep. 12).   Thus, the results of the survey cannot be generalized to what Mr. Gelb considers the entire relevant population.  (Ford Decl. ¶ 27.)

- The survey never actually attempted to determine if the respondents were eligible based upon Mr. Gelb's own definition of the relevant population as nurses who regularly access supply cabinets, since the respondents were never asked if they do so.  (Ford Decl. ¶¶ 28-29.)

- Because the survey was done over the Internet, there could be no real assurance that the targeted respondents (*i.e.*, nurses) actually completed the surveys themselves, or that they did so at their workplace (which was critical to Mr. Gelb's survey design), or that the same person completed the "follow-up" survey as the original survey.  (Gelb Dep. 29-31, 37, 59-60, 64; *see also* Ford Decl. ¶ 27 n.3.)

▪ The survey presupposed that both CHLORAPREP and CHLORASCRUB products will be found in the very same medical supply closets in hospitals and clinics. (Gelb Decl. 3.) But the evidence of record suggests that this is *not* likely to be the case; hospitals will normally stock one or the other. (Fleming Decl. ¶¶ 3-5; *see also* Ford Decl. ¶ 34.)

▪ The survey's Question 4 was improperly leading. (Ford Decl. ¶ 36.) Moreover, it first expressed interest in "familiarity" with branded products, but then asked if the respondents "use" these products. Familiarity and use are totally different concepts. (Gelb Dep. 23-24.) A respondent might have been "familiar" with Nice-Pak's CHLORASCRUB product through advertising, even if he or she hadn't ever used it. The respondents were likely at sea as to which part of this "compound" question they were expected to answer. (*See* Ford Decl. ¶ 36 n.6.)

▪ The survey failed to take into account — in any way — the possibility that packaging and labeling will diminish any possibility of confusion. (*See* Gelb Dep. 9.) This was a fatal flaw, particularly since the packaging for the two products is so clearly different. (Ford Decl. ¶¶ 30-32.) Thus, the responses were based completely on the names CHLORASCRUB and CHLORAPREP divorced from any "real world cues" such as packaging, logos and labeling. (*Id.* ¶ 10.)

▪ The survey "follow-up" requested that respondents go into their supply closets, but there is no way of knowing if the respondents actually went to the trouble of doing so (particularly if they completed the survey from home). (Gelb Dep. 67-68.)

*          *          *

For these and the other reasons explained in Dr. Ford's declaration, the Court should give the Gelb survey no weight at all.

### f.    Medi-Flex's "Inference" Of Wrongful Intent By Nice-Pak Is Baseless

Medi-Flex argues that this Court should infer an intent to deceive and confuse on behalf of Nice-Pak because — according to Medi-Flex — Nice-Pak adopted the mark CHLORASCRUB because it is so similar to CHLORAPREP.  (Medi-Flex Br. 14-15.) Medi-Flex insinuates that, "[t]his likely was no accident . . . ."  (*Id.* at 15.)

Medi-Flex is at least right about the second part: the introduction of Nice-Pak's present CHLORASCRUB product was indeed "no accident."  On the contrary, it was an attempt to reap the benefit of and expand upon the considerable good will *Nice-Pak* had already developed for CHLORASCRUB products as a result of numerous years of use `of CHLORASCRUB on closely related products in the United States and in Canada.

*          *          *

Given that each of the relevant factors favors Nice-Pak, no likelihood of confusion exists.  Therefore, it is not likely that Medi-Flex will prevail on its claims.

### B.    Medi-Flex's Claim Of Irreparable Injury Is Belied By Its Own Egregious Delay And By Hard Facts

In determining whether a plaintiff seeking a preliminary injunction is suffering irreparable harm, actions speak louder than words.  Medi-Flex's dire predictions of horrific consequences if no injunction is granted evaporate in the cold light of day, given the hard and inescapable facts.

### 1.   No "Presumption" Of Irreparable Harm Is Warranted Here

To begin with, Medi-Flex claims entitlement to a presumption of irreparable harm. (Medi-Flex Br. 15.)  However, that presumption requires a strong showing that Medi-Flex will prevail in proving trademark infringement.  If that is not the case — and it is not — the presumption disappears.  *See Primedia Intertec Corp. v. Tech. Mktg. Corp.*, 35 F. Supp. 2d 809, 823 (D. Kan. 1998).

### 2.   Medi-Flex Sat On Its Purported Rights For At Least Six Months

Medi-Flex's long delay in filing suit and seeking an injunction defeats its assertion of irreparable harm.  It is a matter of record that Medi-Flex knew about Nice-Pak's intention to begin selling its CHLORASCRUB product at least as early as June 2005, when Nice-Pak issued a press release to that effect.[11]  On July 12, 2005, Medi-Flex's attorneys sent a protest letter to Nice-Pak primarily addressing a number of advertising claim issues, in which they also asserted — almost as a throwaway — that there was a likelihood of confusion between CHLORAPREP and CHLORASCRUB.  (Autore Decl. Exh. C.)  On July 28, 2005, counsel for Nice-Pak responded, asserting that no likelihood of confusion existed.  (*Id.* Exh. D.)  Medi-Flex took no action until it filed this complaint in January of 2006, some six months after it asserted infringement and was told by Nice-Pak that none existed.[12]

---

[11] Medi-Flex describes this seven-month-old event as having occurred "recently." (Medi-Flex Br. 2.)

[12] To be sure, if Medi-Flex believed it had a valid claim, it was not required to wait until Nice-Pak began shipping its product.  *See, e.g., Standard Oil Co. of N.M. v. Standard Oil Co. of Cal.*, 56 F.2d 973, 976 (10th Cir. 1932) ("Neither reason nor authority required plaintiff to wait until the threatened injury occurred."); *Maritz, Inc. v. Cybergold, Inc.*, 947 F. Supp. 1328, 1335 (E.D. Mo. 1996) ("A Lanham Act claim can exist even before a defendant actually opens the business, so long as the acts of defendant are imminent and impending.").

It is well-settled in this Circuit and this Court that delay in seeking relief undercuts any claim of immediate and irreparable harm. *See, e.g., Kan. Health Care Ass'n v. Kan. Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1543-44 (10th Cir. 1994); *Adidas Am. v. Nat'l Collegiate Athletic Ass'n*, 40 F. Supp. 2d 1275, 1282 (D. Kan. 1999). This rule has long been applied within this Circuit in trademark infringement cases. *See, e.g., GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984) ("Delay in seeking relief, however, undercuts any presumption that infringement alone has caused irreparable harm *pendente lite*; therefore, such delay may justify denial of a preliminary injunction for trademark infringement."); *Paramount Pictures v. Video Broad.*, 724 F. Supp. 808, 822 (D. Kan. 1989) (presumption of irreparable injury "is undercut when the plaintiff has delayed seeking injunctive relief.  This rule is simply explained as averting the incongruity of allowing a plaintiff to rest on its rights yet later request and obtain swift and immediate relief from the court." (citation omitted)).

While Medi-Flex delayed seeking relief for six months from the issuance of Nice-Pak's press release, in reality, Medi-Flex's actual delay goes back several years from the time Nice-Pak began using CHLORASCRUB in Canada in 2001, with goods shipped in commerce from the United States.  (*See supra* Part IV.A.2.a.)  Had Medi-Flex really believed it was being harmed by Nice-Pak's use of CHLORASCRUB, it plainly could have brought suit at any time starting in 2001 — but it never did.

Without question, as indicated above, Medi-Flex's actions — or, more accurately, Medi-Flex's *inaction* — over many months, if not years, speak louder than Medi-Flex's current litigation-induced protestations of irreparable harm.

Medi-Flex asserts that the purpose of a preliminary injunction is to preserve the status quo pending trial. (Medi-Flex Br. 3.) But Medi-Flex's own delay has allowed that status quo to change, from a situation in which Nice-Pak was planning to launch its CHLORASCRUB product several months ago, to a situation in which Nice-Pak is actively selling CHLORASCRUB products, which are now working their way through the distribution chain into hospitals and other treatment venues. Accordingly, as a direct consequence of Medi-Flex's delay, maintaining the status quo now militates in favor of denying Medi-Flex's present motion.

### 3.   Medi-Flex's Other Arguments Regarding Irreparable Harm Are Belied By Hard Facts

Perhaps concerned that a presumption of irreparable harm will not carry the day, Medi-Flex submits a variety of declarations predicting dire consequences to Medi-Flex and its reputation if an injunction is not granted. In a nutshell, Medi-Flex asserts that because Nice-Pak's CHLORASCRUB product has 3.15% chlorhexidine gluconate ("CHG"), as compared with Medi-Flex's CHLORAPREP having 2% CHG, there will be — we are told — a frightening number of instances of skin irritation caused by CHLORASCRUB. And — according to Medi-Flex — this will hurt the reputation of Medi-Flex and its CHLORAPREP product with its customers and even — we are told — with the FDA.

As Nice-Pak will demonstrate, this argument amounts to speculation built upon total fiction. These claims are "reckless, unsubstantiated and false" (Fleming Decl. ¶ 6), and as admitted by a Medi-Flex declarant, they are belied by a withheld study done by Medi-Flex itself.

To begin with, Nice-Pak's CHLORASCRUB product has been approved by the FDA as safe and effective. Medi-Flex would have this Court to rule that the FDA made a mistake. The evidence of record suggests the very opposite.

The CHG studies relied upon by Medi-Flex in its motion papers (*see* Crosby Decl. ¶ 3) involved CHG used *as a hand wash by nurses as much as 24 times per day over a 5-day period*. (Crosby Dep. 14-15, 25, 30-31; Fleming Decl. ¶¶ 7-8.) This bears no relationship to the intended (and FDA-approved) use of CHLORASCRUB, which is to be applied topically to *patients* before certain surgical and similar procedures — *i.e.*, once, and perhaps once again a day or two later. Ms. Crosby herself acknowledges in a 2002 letter that hand-washing and patient preoperative applications are "distinct." (Wepner Decl. Exh. M; Crosby Dep. 39-40.) It is grossly misleading to apply studies which involve dozens of applications per day over several days by nurses washing their hands, with an arena in which the product is applied once (or perhaps twice) to a surgical site.

Putting that aside, the studies relied upon by Medi-Flex in this proceeding demonstrate that usage of between 2% and 4% CHG — even as a hand wash — is extremely common if not totally conventional. And while one of the studies stated that products containing 4% CHG would cause dermatitis more frequently than those containing lower concentrations, in the very same paragraph, it was noted that in one five-day clinical trial, a detergent containing 4% CHG caused less irritation than plain bar soap. (Crosby Dep. 24 (quoting Crosby Decl., Medi-Flex Exh. K at 9 of 15).) Of course, even if there was some increased skin irritation with a hand wash used dozens of times a day over several days where there was a 4% CHG concentration, it must be kept in mind that Nice-Pak's CHLORASCRUB product has only 3.15% CHG.

Regrettably, Medi-Flex did not choose to provide this Court with its own study that more realistically relates to the effect of CHG in the real world environment in which Nice-Pak's CHLORASCRUB product will be used.   In particular, a Medi-Flex study known as "Protocol CXA1004" (Wepner Decl. Exh. L) was recently found on Medi-Flex's Web site.   It provides data on irritation caused where there were three applications over a period of five days.   Data was generated for "fully occluded" dressings (*i.e.*, pads covered on all sides with tape) and "semi-occluded" condition where tape is not employed (*e.g.*, a site covered with gauze).   The Medi-Flex study boasted that concentrations of 0.5% and 2.0% CHG demonstrated moderate degrees of irritation under full occlusion; and that under semi-occluded conditions (*e.g.*, gauze dressing), the irritation capacity was reduced to a level close to that of normal saline, which was apparently chosen as a "nonirritant" control.

But Medi-Flex did not mention to this Court that, according to data in this Medi-Flex study, under both fully occluded and semi-occluded conditions, *a detergent with 4% CHG (Hibiclens[®]) caused less irritation than the 0.5% and 2.0% CHG products that were tested*; and under semi-occluded conditions, *the 4% CHG Hibiclens[®] product actually caused <u>less</u> irritation than the "nonirritant" saline control!*   (McBride Dep. 27-28.)   Indeed, Medi-Flex's declarant who had asserted that it was "well established in the scientific literature" that increased levels of CHG caused increased patient skin irritation (McBride Decl. ¶ 4) admitted at her deposition that the foregoing Medi-Flex study (Wepner Decl. Exh. L) that was not produced in this case was "inconsistent" with her declaration (McBride Dep. 29-32; *see also* Marchand Decl. ¶¶ 16-20).

Still further, Les Enterprises Solumed Inc. of Quebec, Canada ("Solumed"), Nice-Pak's development partner and owner of the New Drug Application for CHLORASCRUB which was approved last year, performed a study in 2001, testing the actual formulation of CHLORASCRUB (*i.e.*, 3.15% CHG with 70% isopropyl alcohol) under semi-occluded conditions. The test demonstrated that the CHLORASCRUB formulation is no more irritating than a formulation with 2% CHG (such as is used in CHLORAPREP) and was actually equivalent in producing irritation to saline solution. (Marchand Decl. ¶¶ 10-15; *see also* Fleming Decl. ¶ 9.)

Thus, the basic premise upon which Medi-Flex builds its irreparable harm argument — *i.e.*, the parade of horribles that would follow from Nice-Pak's 3.15% CHG concentration causing increased skin irritation — is simply unfounded.[13] But even if there was some factual basis to this contention, the suggestion that this would trigger the doomsday scenario painted by Medi-Flex is simply rank speculation.

Specifically, Medi-Flex posits that if a nurse or some other user of Nice-Pak's CHLORASCRUB product were to notice severe irritation, that person would mistakenly believe the problem was caused by Medi-Flex's CHLORAPREP product and contact Medi-Flex to report this. This assumes — incorrectly — that hospitals will simultaneous stock both products (they will not), that mere sensitivities or irritations must be reported (they need not be), and that healthcare professionals will act carelessly in investigating (a baseless and insulting assumption). (*See* Fleming Decl. ¶ 10 ("Healthcare professionals

---

[13] With all the "smoke" created by Medi-Flex regarding higher CHG concentrations allegedly causing more irritation, one could easily lose sight of the fact that CHLORASCRUB's higher CHG concentration means it will have greater efficacy in killing microorganisms and viruses. (Crosby Dep. at 17-18, 26.) Thus, one must consider the possibility that the real motivation behind this motion is to force a better (yet equally safe) product off the market.

do not merely make guesses at what product was used.  Instead they refer to standard operating procedures, review products on hand and carefully document all of their actions").)  Medi-Flex also appears to believe that its own personnel who would field this fictitious complaint would not take the trouble to find out whether the user in question is actually a Medi-Flex customer and whether the product which caused this hypothetical problem was actually CHLORAPREP.  This contention, too, is baseless.

In short, Medi-Flex's argument of irreparable harm amounts to baseless "the sky is falling" speculation that — at bottom — rests on a bogus factual premise.  It is certainly insufficient proof of irreparable harm to support the preliminary injunction which Medi-Flex here seeks.

### C.    Nice-Pak Would Be Grievously Injured By An Injunction

As documented in the declaration of Linda Autore, Nice-Pak has spent some five years and has invested well over $5,000,000 in bringing its CHLORASCRUB product to the U.S. market, including research and development, facility investments, raw materials, finished inventory, and obtaining FDA approval.  (Autore Decl. ¶ 21.)

Moreover, the fact that Nice-Pak's CHLORASCRUB product requires FDA approval exacerbates the harm to Nice-Pak that would be caused by an injunction at this time.  Although Nice-Pak could select an alternative name, it would be required to go through the entire FDA approval process once again.  Thus, it could take as much as an additional *six to nine months* for Nice-Pak to be in a position to launch its product under an alternative trademark (*id.* ¶ 24), and rebranding the product would cost in excess of $1,000,000 (*id.* ¶ 21).

Still further, almost 2,000 existing Nice-Pak customers have been contacted and have expressed interest in CHLORASCRUB, and trials are under way in some 388

facilities.  (*Id.* ¶ 20.)  An injunction would do irreparable damage to Nice-Pak's reputation and could even place other Nice-Pak products at risk.  (*Id.* ¶ 23.)

Clearly, the harm Nice-Pak would suffer if an injunction is granted far outweighs the totally speculative harm to Medi-Flex that is argued in Medi-Flex's motion papers.

###     D.      The Public Interest Militates Against An Injunction

The public interest favors competition in lieu of Medi-Flex's monopoly. Medi-Flex's motion papers boast of its share in the market for products of the type sold by the parties to this action.  (*See, e.g.*, Medi-Flex Br. 6 n.5 ("Medi-Flex currently has . . . nearly 100 percent market share in the hospital vascular access market for FDA-approved CHG antiseptic applicators."); Schreiber Decl. ¶ 9 ("the CHLORAPREP products are the first and, until recently, the only patient preoperative skin prep products in the U.S. that have the Center for Disease Control's (CDC's) recommended 2% CHG formulation and the Food and Drug Administration's (FDA's) approval.").)

One would think that Medi-Flex had a relevant patent or some other form of *legal* monopoly.  However, even in patent infringement cases, courts have denied preliminary injunctions based in part on the public interest associated with competition.  *See, e.g., Ill. Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 684 (Fed. Cir. 1990) (public interest in protecting patent rights counterbalanced by the defendant's right to compete which must be seen as legitimate at this stage in view of the plaintiff's remote showing of likelihood of success).

As a separate matter, given what Nice-Pak believes is the superiority of its CHLORASCRUB product over Medi-Flex's CHLORAPREP (*see* Part IV.B.3), the fact that an injunction would deprive healthcare professionals of a useful tool is a public interest factor that also militates against preliminary injunction.  *See Ethicon*

*Endo-Surgery v. U.S. Surgical Corp.*, 855 F. Supp. 1500, 1517 (S.D. Ohio 1994) (testimony indicated that medical community preferred defendant's products; while relative merits of the products is disputed, to "suddenly withdraw these devices from the market could have a serious disruptive effect on surgical practice").

Accordingly, since an injunction would not vindicate any legitimate trademark rights of Medi-Flex, the public interest in this particular case weighs *against* the granting of an injunction.

### E.    If An Injunction Is Granted, A Substantial Bond Is Necessary

While Nice-Pak strenuously asserts that no injunction should be granted at all, Nice-Pak nonetheless believes it must address the issue of a bond in the event the Court disagrees.

As discussed above, an injunction will place at risk the enormous financial investment which Nice-Pak has made in its CHLORASCRUB product. (*See* Autore Decl. ¶ 21.)  Moreover, Nice-Pak has forecast that it will have approximately $6,000,000 in sales of CHLORASCRUB products over the next four months and approximately $22,000,000 over the upcoming 12 months.  (*Id.* ¶ 20.)

Taking into account Nice-Pak's investment to date, and the anticipated sales which Nice-Pak would lose on account of an injunction, Nice-Pak estimates that the total cost of an injunction (which Nice-Pak believes should not be granted at all) would be in excess of $15,000,000.  (*Id.* ¶ 22.)

Accordingly, if the Court grants the requested injunction — and, emphatically, the Court should not do so at all — it should require Medi-Flex to post a bond of at least $15,000,000.

## V.    CONCLUSION

For all of the foregoing reasons, Medi-Flex's motion for a preliminary injunction should be denied.

Respectfully submitted,


_/s/ Jeffrey J. Simon_
Jeffrey J. Simon,   KS #15231
Philip Dupont
HUSCH & EPPENBERGER, LLC
1200 Main Street, Suite 2300
Kansas City, MO 64105
Tel.:   816.329.4711
Fax:    816.421.0596

Arnold H. Krumholz
Roy H. Wepner
Gregg A. Paradise
LERNER, DAVID, LITTENBERG,
KRUMHOLZ & MENTLIK, LLP
600 South Avenue West
Westfield, NJ 07090-1497
Tel:    908.654.5000
Fax:    908.654.7866

Attorneys for Defendants Nice-Pak
Products, Inc.and Professional Disposables,
Inc.


## CERTIFICATE OF SERVICE


I hereby certify that on February 22, 2006 I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which sent notification of such filing to the following:

| | |
|---|---|
| Bart Alan Starr | bstarr@shb.com |
| Basil Trent Webb | bwebb@shb.com |
| Jonathan N. Zerger | jzerger@shb.com |

/s/ Jeffrey J. Simon
Jeffrey J. Simon