IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **MEDI-FLEX, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | **CIVIL ACTION** |
| ) | |
| **v.** ) | **No. 06-2015-KHV** |
| ) | |
| **NICE-PAK PRODUCTS, INC. and** ) | |
| **PROFESSIONAL DISPOSABLES, INC.,** ) | |
| ) | |
| **Defendants.** ) | |
| _____) | |

## MEMORANDUM AND ORDER

Medi-Flex, Inc. ("Medi-Flex") brings suit against Nice-Pak Products, Inc. and Professional Disposables, Inc., its healthcare division, (collectively, "Nice-Pak") for trademark infringement, false designation of origin and unfair competition under the Lanham Act, 15 U.S.C. §§ 1114 and 1125. This matter is before the Court on Medi-Flex, Inc.'s Motion For Preliminary Injunction to prevent Nice-Pak from using the name "Chlorascrub" during the pendency of this case. See Doc. #3 filed January 24, 2006. On March 1, 2006, the parties presented oral argument and agreed to submit the matter based on evidence which they submitted at the hearing and in support of their briefs. For reasons stated below, the Court overrules plaintiff's motion.

### Preliminary Injunction Standards

The purpose of a preliminary injunction is "to preserve the status quo pending the outcome of the case." Tri-State Generation & Transmission Ass'n., Inc. v. Shoshone River Power, Inc., 805 F.2d 351, 355 (10th Cir. 1986). A preliminary injunction is a drastic and extraordinary remedy, and courts do not grant it as a matter of right. Paul's Beauty Coll. v. United States, 885 F. Supp. 1468, 1471 (D. Kan.

1995); 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Fed. Practice & Proc. § 2948, at

128-29 & nn.3, 6-7 (1995).  To obtain a preliminary injunction, plaintiff must establish (1) a substantial

likelihood that it will eventually prevail on the merits; (2) irreparable injury unless the preliminary injunction

issues; (3) that the threatened injury outweighs whatever damage the proposed preliminary injunction may

cause defendants; and (4) that the preliminary injunction, if issued, will not be adverse to the public interest.

Tri-State, 805 F.2d at 355.  The Court must deny injunctive relief if plaintiff fails to establish any requisite

element, Packerware Corp. v. Corning Consumer Prods. Co., 895 F. Supp. 1438, 1446 (D. Kan. 1995),

and plaintiff must establish by clear and unequivocal proof that it is entitled to injunctive relief.[1]  Penn v. San

Juan Hosp., Inc., 528 F.2d 1181, 1185 (10th Cir. 1975); Paul's, 885 F. Supp. at 1471.

### Facts

Based on the record evidence, the Court makes the following findings of fact:

On July 5, 1988, Nice-Pak registered a trademark for "Chlorascrub" with the United States Patent

and Trademark Office (the "PTO").[2]  The Chlorascrub mark remained on the PTO register until January

9, 1995, when it was canceled because Nice-Pak did not file an affidavit of continuing use.

In 1995, Medi-Flex registered with the PTO a trademark for "Chloraprep."  Before it registered

the trademark, Medi-Flex hired legal counsel to search federal trademark records to determine the

---

[1]        Defendant contends that because a preliminary injunction would disturb the status quo, a
heavier burden of proof applies.  See Primedia Intertec Corp. v. Tech. Mktg. Corp., 35 F. Supp.2d 809,
814 (D. Kan. 1988) (under certain circumstances movant must show four factors weigh "heavily and
compellingly" in movant's favor).  The Court need not reach this issue because it finds that plaintiff is not
entitled to a preliminary injunction under the lighter burden of proof.

[2]        Chlorascrub was apparently registered for a hand cleansing product to be sold in a bucket
container, but Nice-Pak never actually marketed such a product under the 1988 trademark.

2

probable registrability of "Chloraprep" for use in connection with antiseptics.  Counsel's search revealed nine marks with a prefix identical or similar to "chlora" – Cloralex, Chloraderm, Clorital, Clor-o-fen, Chlor-tergent, Clorpactin, Chlorohex, Chlor-tab and Chlorazene.  See letter dated October 7, 1993 from Hovey, Williams, Timmons & Collins to Becky Minion.[3]  In addition, the search revealed 12 marks which used the suffix "prep."  With respect to the number of marks which contained similar prefixes and suffixes, counsel advised as follows:

> Although the prefix chlora and the suffix derm[4] are used individually in several different trademarks noted during the search, these two word segments are never used together in a single mark in a manner similar to the proposed CHLORAPREP mark.  In view of the presence of several marks employing the prefix chlora or the suffix derm separately from one another, it does not appear that the mark will be very strong and others will be able to adopt similar marks by substituting similar prefixes or suffixes.  However, we do not believe that there will be a likelihood of confusion between the proposed mark and any of the marks noted during the search, as used in connection with antiseptics.

Id.[5]  Counsel concluded that the mark appeared clear for use and registration, and so advised plaintiff.  Id.

Since 1995, Medi-Flex has continuously and extensively used the Chloraprep trademark in the United States with respect to topical antimicrobial solution applicators.  Chloraprep products comprise 21 per cent of the hospital vascular access market and nearly 100 per cent of the hospital vascular access

---

[3]     The Court inadvertently failed to receive the letter into evidence at the time of the hearing. It does so now, through this order.

[4]     The context of the letter indicates that the writer mistakenly referred to the suffix "derm" instead of "prep."

[5]     Medi-Flex had previously asked counsel to perform a search for the marks "Chloraprep" and "Chloralprep" for use with antiseptic products and "Chloraderm" and "Chloralderm" for use with bacterial hand lotions.  That search revealed the mark "Chlorascrub."  See letter dated June 18, 1993 from Hovey, Williams, Timmons & Collins to Becky Minion.  The record is not clear why Chlorascrub came up in the first search but not the second.

market for FDA approved antiseptic applicators containing chlorhexidine gluconate (CHG) and isopropyl alcohol (IPA).  As a result of widespread use of Chloraprep products, the trademark has become well known in the marketplace.

Since 2001, Medi-Flex and Nice-Pak have sold competing products in Canada.  Specifically, under the trademark Chlorascrub, Nice-Pak sells a .5 per cent CHG and IPA antiseptic skin preparation product.  Under the name Chloraprep, Medi-Flex sells an equivalent product (originally in a .5 per cent CHG formulation and more recently in a 2.0 per cent CHG formulation).

In June of 2005, Nice-Pak issued a press release which stated that it planned to launch an antiseptic skin preparation product called Chlorascrub with 3.15 per cent CHG in the United States.[6]  This new product will directly compete with Chloraprep in the United States.  Both applicators contain a solution of CHG and IPA; both are advertised in the same magazines and journals; and both will be sold and distributed through the same channels.  Both will be used in the same manner for the same purpose: to prep patients for surgery, insert intravenous lines ("IVs") or catheters and to perform other medical procedures.

Plaintiff recently commissioned a market awareness study.  The study conducted hundreds of structured telephonic interviews with medical professionals in large metropolitan acute care hospitals.  Of the respondents, 70 per cent indicated that their hospital used Chloraprep and 89 per cent indicated that they had heard of Chloraprep products and/or readily identified Chloraprep as a new skin preparation antiseptic product which had been introduced in the market in recent years.  At least in part, this high level

---

[6]     Medi-Flex asserts that the higher concentration of CHG in Chlorascrub will cause increased skin irritations which will be mistakenly attributed to Chloraprep.  The Court rejects this assertion as speculative and unsupported by clear and unequivocal evidence.

4

of market awareness results from plaintiff's extensive efforts to advertise and educate the market regarding its flagship line of Chloraprep products. Over the last five years, plaintiff has spent more than $20 million on such efforts.

Plaintiff also hired an expert, Gabriel M. Gelb, to conduct a survey regarding marketplace confusion between Chloraprep and Chlorascrub. The survey included more than 200 registered nurses who conduct preoperative medical procedures which require them to apply topical skin antiseptics. The questionnaire asked the nurses whether they used certain products which are commonly used in such procedures, specifically "Barrett" exam gloves, "Avagard" hand antiseptic and "Chlorascrub" topical antiseptic. Fifteen per cent of the nurses responded that they use Barrett exam gloves. Gelb used Barrett exam gloves as a control product to measure "noise" in the survey, i.e. the proportion of respondents who were inattentive or answered by guessing, because Barrett exam gloves do not exist.[7] Forty-three per cent of the nurses responded that they used Avagard hand antiseptics, which are available to and relatively well known by medical professionals.[8] Sixty-one per cent (130 nurses) indicated that they used Chlorascrub topical antiseptic, even though – at the time of the survey – defendants had marketed Chlorascrub products in trade journals but not yet sold it in the marketplace. Of the 130 nurses who stated that they used Chlorascrub, 27 nurses stated that they knew which company made or marketed the brand. When given

---

[7]    The record does not disclose any rationale or methodology which attributes statistical significance to the 15 per cent level of "noise." It is not clear whether exam gloves are marketed under any name which is similar to Barrett. If not, it is difficult to see how the amount of guessing or inattention concerning a non-existent product with a fictional name would correspond to the degree of guessing or inattention between similar products with similar names, such as Chloraprep and Chlorascrub.

[8]    The point of this question is not clear, since the record does not reveal what percentage of the nurses actually used Avagard, or what percentage of the nurses were mistaken, inattentive or guessing.

5

a multiple-choice question as to the maker or marketer of Chlorascrub products, 13 nurses chose PDI/Nice-Pak, nine selected Medi-Flex, three chose "other" and two selected "don't know."

Of the nurses who said that they used Chlorascrub but could not name the company which made it, Gelb conducted a follow-up survey. The follow-up survey asked the nurses to check their medical supply areas and state which brand or brands of topical antiseptic they found. Seventy-three nurses responded to the follow-up survey: 22 found Chloraprep alone or together with another product, 30 found generic products and 21 found other products. In other words, of the 73 nurses who claimed to use Chlorascrub but did not know who made or marketed it, 22 were using Chloraprep and 51 were actually using products other than Chloraprep – suggesting that they might have been confused but maybe not thinking about Chloraprep.[9]

Based on the survey results, Gelb formed the following opinion:

> A high likelihood of confusion exists within the relevant population – registered nurses who use topical antiseptics – about the Chloraprep and Chlorascrub marks. Six out of ten said they used Chlorascrub but none who went back to look in their medical supplies area found any Chlorascrub products. Even adjusting for "noise," – those who identified a non-existent brand – the extent of confusion is in the 45% range.

Declaration of Gabriel M. Gelb at 3, Exhibit N to Plaintiff's Motion (Doc. #3).

Plaintiff and defendants sell their products through a network of distributors which in turn sell to hospitals and clinics. Plaintiff also sells Chloraprep to kit manufacturers who include the product in pre-

---

[9]   The record is not clear why Gelb only directed the follow-up survey to nurses who could not name the company which made or marketed Chlorascrub. Indeed, the point of the follow-up survey is unclear. Obviously, it was not designed to test whether nurses were confused about the respective sources of Chloraprep and Chlorascrub, because Gelb only questioned nurses who could not say who manufactured Chlorascrub.

packaged kits for medical procedures.  The employees who work for these distributors and kit manufacturers are not highly trained medical professionals and do not have extensive knowledge regarding the products which they sell.  Chloraprep and Chlorascrub are relatively inexpensive on a per unit basis, i.e. from 50 cents to seven dollars per unit.  The parties sell them in cases, however, which range in price from $120 to $1,000 per case.

Hospitals generally stock products by either Chloraprep or Chlorascrub, not both.[10]  The purchasers and users of Chloraprep and Chlorascrub are highly trained medical and administrative professionals at hospitals, blood banks and medical clinics.  They receive detailed information and training regarding such products directly from manufacturers.  The selection process for new medical products in a hospital is generally quite involved.  For an antiseptic product, the first step is usually to introduce the product to the persons in charge of infection control.  Upon approval by infection control, the product may be introduced to end-users or to an evaluation committee to determine whether the hospital has an interest in the product.  If so, the hospital will typically conduct a short term trial of the product for limited procedures.  If the hospital determines that it desires the product, it will place an order with an independent healthcare distributor.

Before a product can enter actual use in a hospital, it is put "in stock," i.e. delivered to the area of use or central storage area.  Before a new product is put in stock, users typically receive some type of in service training.  For a product like Chlorascrub, such training would include (1) how to open the product

_____

[10]     A possible exception is an operating room, which might stock the 26 mL size of Chloraprep even though the hospital otherwise stocks Chlorascrub products.  The largest Chlorascrub product is 5 mL and it is not intended or marketed for use in operating rooms.

to prevent contamination; (2) proper techniques for use; and (3) an explanation of features and benefits.

Chloraprep and Chlorascrub products are packaged differently. Chloraprep is packaged in solid blue boxes with white and yellow lettering. Chlorascrub boxes are white with a purple stripe and purple lettering. In addition, the individual units are packaged differently. Chloraprep units are in white packaging with blue and/or black lettering. Chlorascrub units are in white packaging with purple lettering and a purple strip with the name "Chlorascrub" in white lettering.

Chloraprep and Chlorascrub also sell different sized product units, at least some of which appear different in function and appearance. Chloraprep is packaged in a 0.67 mL SEPP ampule; a 1.5 mL FREPP sponge pad applicator; 1.75 mL single swabstick applicator; 5.25 mL triple swabsticks; a 10.5 mL applicator; and a 26 mL applicator. See Plaintiff's Exhibits 601-05; Defendants' Exhibits 430-431. Chlorascrub is packaged in a 1.0 mL swab (pad); a 1.6 mL swabstick; and a 5.1 mL maxi swabstick. See Defendants' Exhibits 433-34; Fleming Declaration, Doc. #20 at ¶ 20.

Plaintiff claims that the following events demonstrate actual marketplace confusion between Chloraprep and Chlorascrub:

- On January 25, 2006, a Medi-Flex customer requested the catalog part number for a 5 mL applicator. Chlorascrub is available in a 5 mL maxi swabstick. Medi-Flex responded that it made 3 mL and 10.5 mL applicators, but not a 5 mL applicator. The customer replied that he thought Medi-Flex made a 5 mL applicator.

- On February 8, 2006, an unidentified caller inquired regarding a Medi-Flex prep pad. Nice-Pak offers a prep pad under the name Chlorascrub. Medi-Flex

responded that it did not make a prep pad.  The caller stated that she thought Medi-Flex made a prep pad.

•    On February 13, 2006, Christine Waring, a Medi-Flex sales representative, conducted an operating room evaluation for the Rhode Island Veterans Affairs Medical Center.  After she had finished educating surgeons and nurses on the proper application of 10.5 mL and 26 mL Chloraprep applicators, she was paged over the intercom as follows: "Could the Chloraprep wipe girl please come back to the O.R."  Waring returned to the operating room and found that the nurse anesthetist needed equipment cleaning wipes for the anesthesia cart.  When the nurse saw her, she stated, "Wait, you're the rep that sells the skin preps, not the cloth to clean the tables."  The nurse stated that the previous week, a representative talked about cleaning wipes and also discussed Chlorascrub patient preparation.  The nurse asked Waring whether she sold Chlorascrub products and worked for the same company.

•    On February 15, 2006, Waring met with Dr. Richard Ellison, III at the University of Massachusetts Medical Center, which uses Chloraprep for preoperative procedures.  Waring began talking with Dr. Ellison about expanding the hospital's use of Chloraprep into the anesthesiology unit.  Dr. Ellison responded, "Are you the one that's half the price and presented this morning?"  Waring replied that she was with Chloraprep and did not present a product that morning.

•    After Waring met with Dr. Ellison, she had a telephone conversation with Fatima

9

Muriel, an infection control practitioner at the Women and Infants Hospital in Providence, Rhode Island.  Muriel suggested that Waring make a presentation at the next meeting for infection control practitioners of South New England because there was a lot of confusion between Chlorascrub and Chloraprep.

- On February 20, 2006, Greg Bender, manager of distributions for Medi-Flex, spoke with Jill Maciag, manager for Cardinal Health, Inc., one of Medi-Flex's most important distributors.  Bender asked Maciag whether Cardinal Health had stocked Chlorascrub products.  Maciag replied that Cardinal Health had stocked the products months ago and loaded the product numbers into its system in July of 2005.  During the conversation, it became clear that Maciag was referring to Chloraprep products, not Chlorascrub products.  In fact, Cardinal Health had loaded the product numbers for Chlorascrub into its system but had not yet stocked Chlorascrub products in its distribution warehouses.

## Analysis

To obtain a preliminary injunction, plaintiff must establish by clear and unequivocal evidence (1) a substantial likelihood that it will eventually prevail on the merits; (2) that it will suffer irreparable injury unless the preliminary injunction issues; (3) that the threatened injury outweighs whatever damage the proposed preliminary injunction may cause defendants; and (4) that the preliminary injunction, if issued, will not be adverse to the public interest.  Tri-State Generation, 805 F.2d at 355; Penn, 528 F.2d at 1185; Paul's, 885 F. Supp. at 1471.

10

## I.    Substantial Likelihood Of Success On Merits

To prevail, plaintiff must show a substantial likelihood that the similarity of the marks is likely to cause confusion in the marketplace concerning the source of Chloraprep and Chlorascrub. Section 1114 of the Lanham Act prohibits the unauthorized use of a counterfeit mark or imitation of a registered mark which is likely to cause confusion in the marketplace concerning the source of the different products. See 15 U.S.C. § 1114(1)(a); First Sav. Bank, F.S.B. v. First Bank Sys., Inc., 101 F.3d 645, 651 (10th Cir. 1996). In determining whether a likelihood of confusion exists between two marks, the Court considers the following nonexhaustive factors: (1) the degree of similarity between the marks; (2) the intent of the alleged infringer in adopting its mark; (3) evidence of actual confusion; (4) similarity of products and manner of marketing; (5) the degree of care likely to be exercised by purchasers; and (6) the strength or weakness of the marks. See Sally Beauty Co. v. Beautyco, Inc., 304 F.3d 964, 972 (10th Cir. 2002). These factors are interrelated and no one factor is dispositive. Id. The party alleging infringement has the burden of proving likelihood of confusion. See Jordache Enter., Inc. v. Hogg Wyld, Ltd., 828 F.2d 1482, 1484 (10th Cir. 1987). At all times, the key inquiry is whether the consumer is "likely to be deceived or confused by the similarity of the marks. " Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 780 (1992). In this case, the Court finds that all of the factors weigh in favor of defendants.

### A.    Degree Of Similarity Between The Marks

In determining the degree of similarity between the marks, the Court looks at three factors:  sight, sound and meaning. See Sally Beauty, 304 F.3d at 972; King of Mountain Sports, Inc. v. Chrysler Corp., 185 F.3d 1084, 1090 (10th Cir. 1999). In doing so, the Court does not consider these factors in isolation; rather, it examines them "in the context of the marks as a whole as they are encountered by consumers in

the marketplace." Id. (quoting Beer Nuts, Inc. v. Clover Club Foods Co., 805 F.2d 920, 925 (10th Cir. 1986) ("Beer Nuts II")).  The Court must determine whether the Chlorascrub mark will confuse purchasers when singly presented, rather than when presented side by side with the Chloraprep mark.  See id. Similarities weight more heavily than differences, particularly when the competing marks are used in virtually identical products which are packaged in a similar manner.  See Beer Nuts II, 805 F.2d at 925.

In this case, the "Chloraprep" and "Chlorascrub" marks are similar, but the similarity is based solely on the fact that both marks begin with the prefix "chlora."  By sight and sound, the words are similar in that they both begin with the prefix "chlora."  When viewed in the context of their packaging, however, the marks do not appear similar.  Chlorascrub is packaged in white boxes with purple lettering and a distinctive purple band with the name "Chlorascrub" in bold white letters.  Chloraprep, on the other hand, is packaged in blue boxes with the name "Chloraprep" in bold yellow letters.  As noted, the words are similar as to sound, in that they are both three-syllable words which start with the prefix "chlora."  The rest of the words, "prep" and "scrub," do not sound alike.  As to meaning, the prefix "chlora" indicates that the products contain a chlorine based ingredient.  Depending on the context, the suffixes may or may not convey somewhat similar meanings: "prep" indicates that one uses the product to prepare and "scrub" suggests that one uses the product to clean with hard rubbing.

The parties agree that the prefix "chlora" is commonly used to describe products which contain chlorine based ingredients.  In Am. Cyanamid Corp. v. Connaught Labs., Inc., 800 F.2d 306 (2d Cir. 1986), the Second Circuit Court of Appeals found no trademark infringement between marks which were similar as a result of their common use of generic or descriptive terms.  That case involved the marks "HIB-

12

IMUNE" and "HibVAX" – which were used by competing manufacturers of Hib vaccine.[11]  The court found that because the similar portion of the marks was a generic term ("Hib"), any consequent finding of confusing similarity must be based on a similarity between the suffixes "IMUNE" and "VAX."  Id. at 308. The Court concluded that even though the suffixes conveyed similar meanings, they were different in length, sound and appearance and were not confusingly similar.  Id. at 308-09.

Here, the similarity between the marks is based solely on the common descriptive prefix "chlora," which describes the chlorine-based ingredient which the products contain.  The Court agrees with American Cyanamid that "[a] trademark holder cannot appropriate generic or descriptive terms for its exclusive use, and a trademark infringement finding thus cannot be based on the use of a generic or descriptive term."  Id. at 308.  Accordingly, the common prefix "chlora" does not support a finding of similarity between the marks.  The suffixes "prep" and "scrub" are not similar, let alone confusingly similar. Therefore, plaintiff has not shown a strong similarity between the marks.

**B.     Intent Of Alleged Infringer In Adopting Its Mark**

Proof that defendants chose a mark with the intent of copying plaintiff's mark may, standing alone, justify an inference of likelihood of confusion.  Beer Nuts, Inc. v. Clover Club Foods Co., 711 F.2d 934, 941 (10th Cir. 1983) ("Beer Nuts I").  Under this factor, the Court focuses on whether defendant had the intent to derive benefit from the reputation or goodwill of plaintiff.  King of Mountain Sports, 185 F.3d at 1091.  "One who adopts a mark similar to another already established in the marketplace does so at his peril, because the court presumes that he can accomplish his purpose: that is, that the public will be

---

[11]      The Hib vaccine is used to vaccinate children against Haemophilus infuenzae type b diseases.  American Cynamid, 800 F.2d at 307.  "Hib" is a generic term for such diseases.  Id.

deceived. All doubts must be resolved against him." Beer Nuts I, 711 F.2d at 941.

As evidence that defendants intend to confuse the market and rely on the goodwill associated with plaintiff's trademark, plaintiff cites the fact that defendants intend to market their product with a similar name. The record, however, does not contain clear and unequivocal proof of any such intent. Indeed, defendants registered the trademark Chlorascrub long before plaintiff registered Chloraprep. Although defendants allowed the Chlorascrub trademark to lapse because of non-use, the fact that they chose the name first is strong evidence that they did not choose the name with intent to copy plaintiff's mark.

### C.      Evidence Of Actual Confusion

Actual consumer confusion is the best evidence of likelihood of confusion between two products. Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co., 22 F.3d 1527, 1534 (10th Cir. 1994). Evidence of actual confusion of a very limited scope, however, may be dismissed as de minimis. King of Mountain Sports, 185 F.3d at 1092. Probable confusion cannot be shown by pointing out that at some place, at some time, someone made a false identification. Id.

Plaintiff points to several events which allegedly demonstrate actual confusion in the marketplace. First, plaintiff cites two customer inquiries about products which Medi-Flex does not make but Nice-Pak does. In both instances, the customers stated that they thought that Medi-Flex made products which it does not make (a 5 mL applicator and a prep pad). Because Nice-Pak makes the products which the customers sought, plaintiff infers that the customers confused Chlorascrub and Chloraprep. The record, however, contains no clear and unequivocal evidence which supports such an inference. Accordingly, the Court affords little weight to the customer inquiries. See, e.g., Jordache, 828 F.2d at 1487 (affording little value to customer inquiry evidence regarding source of product).

14

Plaintiff also points to a nurse who initially thought that a Chloraprep sales representative sold cleaning wipes, but after learning that the sales representative sold Chloraprep products, the nurse asked whether she also sold Chlorascrub products. Rather than showing actual confusion, this evidence suggests that the nurse drew a mental distinction between Chloraprep and Chlorascrub. See Duluth News-Tribune v. Mesabi Publ'g Co., 84 F.3d 1093, 1098 (8th Cir. 1996) (question asking reporter to specify which news tribune he worked for indicated distinction in mind of questioner rather than confusion); Fisher Stoves, Inc. v. All Nighter Stove Works, Inc., 626 F.2d 193, 195 (1st Cir. 1980) (inquiries regarding differences between products and whether companies were affiliated did not show confusion but indicated that customers had different source in mind).

Plaintiff points to an instance where Dr. Ellison asked Waring whether she had presented the product that morning which was half price. The record, however, does not reveal whether Chlorascrub was the product which Dr. Ellison was thinking of and if so, whether Dr. Ellison was confused about the products or about which company employed Waring. This evidence is insufficient to support an inference of actual confusion.

Plaintiff cites an infection control practitioner who suggested that Waring make a presentation at the next meeting for infection control practitioners because there was a lot of confusion between Chlorascrub and Chloraprep. Aside from hearsay problems with this proof, the record does not reflect the type of confusion which the practitioner perceived, i.e. confusion regarding product differences or confusion regarding the source of the products.

Finally, plaintiff points to an instance where a Medi-Flex employee asked the manager of one of its distributors whether she had stocked Chlorascrub products and the manager mistakenly responded by

referring to Chloraprep instead of Chlorascrub products.  At most, plaintiff has cited de minimis evidence of actual confusion.  See King of Mountain Sports, 185 F.3d at 1092 (seven instances of actual confusion de minimis).  Plaintiff has not shown by clear and unequivocal evidence a substantial likelihood of actual confusion in the marketplace.  See, e.g., Duluth News-Tribune, 84 F.3d at 1098 (isolated incidents of actual confusion that occur initially upon creation of potentially confusing mark insufficient to establish genuine issue of material fact as to likelihood of confusion).

Plaintiff contends that Gelb's survey shows that consumers are likely to be confused.  Evidence of confusion may be introduced through surveys, but their evidentiary value depends on the methodology and questions asked.  See Universal Money Ctrs., 22 F.3d at 1534 n 3; Jordache, 828 F.2d at 1487 (evidentiary value of survey depends on relevance of questions asked and technical adequacy of survey procedures).

In this case, Gelb's survey does not clearly and unequivocally demonstrate a likelihood of marketplace confusion as to the respective sources of Chloraprep and Chlorascrub.  As noted, 61 per cent (130 nurses) responded that they used a Chlorascrub topical antiseptic which was not actually available on the market at that time.  From this response, Gelb concluded that 45 per cent of the nurses confused Chlorascrub and Chloraprep.[12]  The responses to Gelb's follow up questions, however, do not support this conclusion.  Of the 130 nurses who stated that they used Chlorascrub, 27 nurses stated that they knew which company made or marketed the brand.  When given a multiple-choice question as to the maker or marketer of Chlorascrub products, nearly half (13) of these nurses correctly chose PDI/Nice-Pak, nine

_____

[12]     As noted, Gelb adjusted the 61 per cent response rate down to 45 per cent based on "noise" – i.e. those who identified the non-existent brand of Barrett exam gloves.

selected Medi-Flex, three chose "other" and two selected "don't know." Thus only nine nurses (seven per

cent of the nurses who claimed to use Chlorascrub) thought that Medi-Flex made Chlorascrub. Moreover,

Gelb conducted a follow-up survey which asked nurses who did not know the source of Chlorascrub to

check their medical supply areas. Of the 73 nurses who responded, 22 found Chloraprep products.[13] The

remaining 51 nurses found other products, which suggests that although they were confused about what

product they used, they did not confuse Chlorascrub and Chloraprep or the respective origins of

Chlorascrub and Chloraprep. Moreover, the record suggests that although nurses may influence a

hospital's purchasing decisions, they do not purchase Chloraprep and Chlorascrub. Gelb's survey sheds

no light on whether the actual purchasers are confused regarding the source of the goods. See, e.g., U.S.

Surgical Corp. v. Orris, Inc., 5 F. Supp.2d 1201, 1211 (D. Kan. 1998) (surgeons' confusion relevant only

to extent it influences hospital's purchasing decision). For these reasons, the Court finds that Gelb's survey

does not show by clear and unequivocal evidence a substantial likelihood of confusion in the market.

### D.      Similarity Of Products And Manner Of Marketing

In evaluating this factor, the Court looks to the similarity of the products and the similarity in the

manner of marketing the products. See Sally Beauty, 304 F.3d at 974. The greater the similarity between

---

[13]      While this evidence might suggest that 22 of 73 nurses confused Chlorascrub and
Chloraprep, the more relevant question is whether the nurses confused the source of the product which they
used. See, e.g., Johnny Blastoff, Inc. v. L.A. Rams Football Co., 188 F.3d 427, 436 (7th Cir. 1999)
(keystone of trademark infringement is confusion as to source, affiliation, connection or sponsorship of
goods or services); Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc., 182 F.3d 598, 602 (8th Cir.
1999) (ultimate inquiry is whether consumers will be confused about source of allegedly infringing product).
Because Gelb directed the follow-up survey to nurses who did not know the source of Chlorascrub, this
data regarding the 22 nurses tells us nothing about whether they confused the sources of Chlorascrub and
Chloraprep.

the products, the greater the likelihood of confusion.  Id.  Plaintiff asserts that the products are similar because they are used for the same purpose: to prep patients for surgery, insert IVs or catheters and perform other medical procedures.  This argument has some merit, but significant differences in packaging and available product forms reduce the possibility of confusion.

Plaintiff argues that the products are advertised in the same magazines and journals and will be sold and distributed through the same channels.  In analyzing the similarity in manner of marketing, the Tenth Circuit considers whether the parties are competitors in consumer markets.  See Heartsprings, Inc. v. Heartspring, Inc., 143 F.3d 550, 556-57 (10th Cir. 1998); First Sav. Bank, 101 F.3d at 656.  The Tenth Circuit has recognized that "[t]he possibility of confusion is greatest when products reach the public by the same retail outlets."  Beer Nuts I, 711 F.2d at 941.  Here, because the products are purchased in bulk by professional buyers, the potential for confusion is diminished.  This factor weighs in favor of defendants.

**E.    Degree Of Care Likely To Be Exercised By Purchasers**

A consumer exercising a high degree of care in selecting a product reduces the likelihood of confusion.  Heartsprings, 143 F.3d at 557.  The Tenth Circuit has explained that "buyers typically exercise little care in the selection of inexpensive items that may be purchased on impulse." Beer Nuts II, 805 F.2d at 926 (quotation omitted).  Accordingly, items purchased on impulse are more likely to be confused than expensive items, which are typically chosen carefully.  See id.  The relevant inquiry focuses on the consumer's degree of care exercised at the time of purchase.  See Universal Money Ctrs., 22 F.3d at 1533.  Here, the evidence suggests that hospitals exercise a high degree of care in selecting products such as Chloraprep and Chlorascrub for hospital use.  This factor weighs in favor of defendants.

18

F.       **Strength Or Weakness Of The Marks**

In evaluating this factor, the Court looks to the distinctiveness of the mark and its recognition among the public. Therma-Scan, Inc. v. Thermoscan, Inc., 295 F.3d 623, 631 (6th Cir. 2002).   For purposes of ruling on plaintiff's motion for preliminary injunction, the Court assumes that Chloraprep is extremely well known in the marketplace.   The Court must nevertheless determine the strength – or distinctiveness – of plaintiff's mark.

The strength of plaintiff's mark is a "highly instructive" factor for the Court to consider.   First Sav. Bank, 101 F.3d at 653.   The stronger the mark, the greater the likelihood that infringement of the mark will cause confusion.   See King of Mountain Sports, 185 F.3d at 1093. The categories of trademarks in ascending order of relative strength are: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful.   See Sally Beauty, 304 F.3d at 975-76.   A generic mark refers to a general class of goods, such as "cola," of which an individual product is a member.   See id.   Such marks do not indicate the particular source of an item and are not entitled to any trademark protection. Id. at 976.   A descriptive mark identifies a characteristic or quality of an article or service, such as its color, odor, function, dimensions or ingredients.   Id.   A descriptive mark is entitled to protection "only when it has acquired a secondary meaning by becoming distinctive of the applicant's goods in commerce."   Id. (quoting Beer Nuts I, 711 F.2d at 939).   Suggestive marks suggest rather than describe a characteristic of the product and require the consumer to use imagination and perception to determine the product's nature.   Id. (quoting First Sav. Bank, 101 F.3d at 655).   Arbitrary marks use common words, symbols and pictures which do not suggest or describe any quality or characteristic of the goods or services.   Id.   Fanciful marks are words invented or selected for the sole purpose of functioning as a trademark.   Id.   Courts consider suggestive, fanciful and

arbitrary marks inherently distinctive and entitled to trademark protection.  See id.

Here, plaintiff's mark is a combination of two descriptive terms, "chlora" and "prep."  As such, while the name "Chloraprep" is entitled to trademark protection, the mark is relatively weak with respect to other marks which contain the identical prefix of "chlora" or suffix of "prep."  See Servo Corp. v. Servo-Tek Prod. Co., 289 F.2d 955, 956 (C.C.P.A. 1961) (descriptive prefix "servo" not accorded great weight in determining similarity of marks); Flintkote Co. v. Tizer, 266 F.2d 849, 852 (3d Cir. 1959) (descriptive prefix "flex" not subject to exclusive appropriation for trademark purposes); Wise v. Bristol-Myers Co., 107 F. Supp. 800, 802-03 (S.D.N.Y. 1952) (no trademark protection in descriptive prefix "buffer"). Indeed, when plaintiff inquired as to the registrability of its mark, counsel opined that "[i]n view of the presence of several marks employing the prefix chlora or the suffix derm[14] separately from one another, it does not appear that the mark will be very strong and others will be able to adopt similar marks by substituting similar prefixes or suffixes."  Letter dated October 7, 1993 from Hovey, Williams, Timmons & Collins to Becky Minion.  The Court agrees and finds that the strength of plaintiff's mark is relatively weak with respect to the descriptive prefix "chlora."  This factor weighs in favor of defendants.

**II.    Irreparable Injury**

Even if plaintiff could show a substantial likelihood that it will prevail on the merits, it has not demonstrated that it will suffer irreparable injury without an injunction.  See GTE Corp. v. Williams, 731 F.2d 676, 678 (10th Cir. 1984) (showing of irreparable injury equally important to likelihood of success in obtaining preliminary injunction for trademark infringement).  Plaintiff alleges that because Chlorascrub

---

[14]     The context of the letter indicates that the writer mistakenly referred to the suffix "derm" instead of "prep."

contains a higher concentration of CHG, it may cause increased skin irritations in patients, and that consumers and the FDA may mistakenly attribute that irritation to Chloraprep. Plaintiff's evidence in this regard is highly speculative. Plaintiff has not shown by clear and unequivocal evidence that it will suffer irreparable injury without a preliminary injunction.

## III.   Balance Of Hardships

A preliminary injunction would impose substantial hardship on defendants. They have spent five years and over $5 million to bring Chlorascrub to the United States market. If the Court required defendants to stop using the name Chlorascrub, they would lose immediate sales and have to obtain approval from the FDA to sell the product under a different name. This factor weighs in favor of defendants.

## IV.   Public Interest

Public interest favors competition in the marketplace. This factor also weighs in favor of defendants.

## V.   Conclusion

Based on the foregoing, the Court concludes that plaintiff is not entitled to prevent Nice-Pak from using the name "Chlorascrub" during the pendency of this case.

**IT IS THEREFORE ORDERED** that Medi-Flex, Inc.'s Motion For Preliminary Injunction (Doc. #3) filed January 24, 2006 be and hereby is **OVERRULED.**

**IT IS FURTHER ORDERED** that in light of this ruling, Defendants' Objections To And Appeal From Magistrate Judge's Order Denying Additional Expedited Discovery Regarding Plaintiff's Awareness Of Defendants' Prior "Chlorascrub" Mark And Registration Pursuant To Local Rule 72.1.4(a) And Fed.

R. Civ. P. 72(a) And Request For Expedited Ruling (Doc. #37) filed March 3, 2006 be and hereby is

**OVERRULED as moot.**

Dated this 7th day of April, 2006 at Kansas City, Kansas.

s/ Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge